Jopling vs. Chachere et als.

---

No. 14,216.

F. M. JOPLING vs. T. C. CHACHERE ET ALS.

SYLLABUS.

The confirmation by the old Board of Commissioners for the Western District of the Territory of Orleans, under the Act of Congress of 1807, of a claim to land based upon occupancy and settlement followed by the confirmation by Congress of the claim so confirmed, operated as effectually as a grant or quit claim from the government. The ownership of the confirmee to the land was not held in abeyance until a patent issued. The patent was simply documentary, recognitive, evidence of the existence of the confirmed title. Property so confirmed became, from the date of the confirmation, subject to State taxation.

2. The mere failure of a tax collector to make, in his deed, recitals of fact which it would have been proper for him to have made, does not render the tax sale to which it refers, *ipso facto*, an absolute nullity, and open as such to a collateral attack, nor does such fact destroy the good faith of the purchaser in taking possession of and holding the property as owner under it.

3. The existence of a defect in a tax sale, resulting from a defect in the assess ment of the property, does not deprive the sale from being made the basis of the prescription of ten years, where defect is a atent one, which the pur chaser was not called upon to ascertain or know.

A PPEAL from the Eighteenth Judicial District, Parish of Acadia— DeBaillon, J.

Edward L. Wells (Boatner, Dodds & Boatner, of Counsel), for Plaintiff, Appellant.

Gilbert L. Dupré, W. C. Perrault and W. J. Sandoz, for Defendants, Appellees.

Removed by writ of error to the Supreme Court of the United States.

## STATEMENT OF THE CASE.

The opinion of the court was delivered by

NICHOLLS, C. J. The plaintiff's prayer in this action is that he be decreed to be the owner of the property which he describes in his petition.

The defendants are Theodore C. Chachere and John P. Boagni, who are alleged to be " trespassing upon said land and claiming to own and be in possession of same by pretended titles, originating prior to the issuance of the patent from the United States, but not from Bennet Joplin, in whose name the patent isued, nor from his heirs or heir."

He alleges that he is the owner of the land by purchase from James H. Houston, Jr., who purchased from the only surviving heir of Bennet Jopling, deceased. That the United States, on July 16th, 1900, issued its patent confirming to Bennet Jopling and his heirs title to said land. That said land was acquired under and by virtue of an act of Congress, approved March 3rd, 1807, and predicated upon the treaties of the United States of America.

He introduced in support of his title, first, an act dated the 22nd day of June, 1900, executed by James H. Houston declaring himself to be the agent and attorney in fact of James H. Houston, Jr., by which the latter, through said agent, sold to the plaintiff for the price of five hundred dollars (without warranty, the purchaser taking the title as it was with a tax title against it) all his rights, claims, title and ownership in and to the land which plaintiff claims in this litigation. In this act it is recited that the land was the same land acquired by the vendor from

J. W. Jopling by act passed before William J. Sandoz, notary public, on *June 15th,* 1895, and duly recorded.

Second—An act *sous seing prive* dated *18th of June,* 1895, between James W. Jopling and James H. Houston, Jr., acknowledged on the same day before John H. Wells, clerk of the court of Hardin County, State of Kentucky, which act was declared on the 24th of June, 1895, by W. J. Sandoz, notary public, to have been produced before him, and the signature of James H. Houston, Jr., to said act duly acknowledged to be his signature in the presence of the witnesses thereto.

In this act James W. Jopling declares that he sells and conveys with full warranty to James H. Houston, Jr., all his rights and titles, interest and demands in and to a certain tract of land situated in the Parish of Acadia, State of Louisiana, containing eight hundred and ninety-eight and ninety-eight-hundredths acres, more or less. (Spanish grant, No. 41, township seven (7) south, range one (1) east. See parish map and a list of private land claims where above described property is well defined as belonging to Bennet Jopling.) The price of the sale was fifty dollars.

Third—A patent from the United States dated July 16th, 1900, in favor of Bennet Jopling, his heirs and assigns. The patent recites that it was granted in accordance with the provisions of the act of Congress of the third of March, one thousand eight hundred and seven. It declares there had been deposited in the general Land Office of the United States a patent certificate numbered fourteen hundred and ninety-nine, issued by the register and receiver of the United States Land Office on the twenty-fifth of May, one thousand nine hundred, whereby it appeared that the private land claim of Bennet Jopling being number one thousand nine hundred and twenty-seven, Class B, in the report of the old Board of Commissioners for the Western District of the Territory of Orleans, was confirmed by the said commissioners under the authority conferred upon them by the act of Congress approved on the 3rd of March, 1807, entitled "An Act respecting claims to land in the Territories of Orleans and Louisiana. That the claim had been regularly surveyed and designated as section forty-nine in township seven, south of range one west, and section forty-one in township seven, south of range one east of the Louisiana meridian, in the Southwestern District of Louisiana, containing eight hundred and seventy acres and six-hundredths of an acre, as appeared by a plat and descriptive notes on file (in the general Land Office) thereof, duly ex-

amined and approved by James Lewis, surveyor general for Louisiana, on the ninth day of May, one thousand nine hundred. That this plat and descriptive notes were inserted and made part of the patent.

The plat and descriptive notes referred to were signed, as recited, by James Lewis, surveyor general of Louisiana, on the 9th of May, 1900.

Immediately following the plat the surveyor general recites that it represents the survey of the private land claim of Bennet Jopling, confirmed by the old Board of Commissioners for the Western District of Louisiana, in pursuance of authority conferred upon them by the fourth section of the act of Congress, approved March 3rd, 1807, entitled "An Act respecting claims to lands in the Territories of Orleans and Louisiana, as appeared by their confirmation certificate No. B 1927, dated March 11th, 1812. After making this recital the surveyor general says: "The following being a description of the survey taken from the approved field notes of N. B. Phelps, deputy surveyor." He then gives the field notes of the survey.

At the end of the document, under date of May 9th, 1900, are the words "examined and approved," followed by the signature of the surveyor general.

Boagni answered, pleading first the general issue. He then averred that he had, by authentic act recorded in the Parish of Acadia on July 24th, 1900, purchased from Victor C. Sitting, in good faith and for a valuable consideration a tract of woodland situated in the Parish of Acadia containing five hundred acres, more or less, being part of section 41, township 7, south range 1, confirmed to Bennet Jopling by certificate B, No. 1927, bounded north by T. C. Chachere, south by heirs of J. C. Brooks, east by Bayou Mallet, and west by E. Veltin and Wm. Johnson, Spanish grant, acquired by his vendor at tax sale, made September 30th, 1871, recorded in St. Landry Parish and duly confirmed by the Auditor of Public Accounts on the 19th of May, 1874. That since the purchase of this land in 1871, his vendor had been in uninterrupted and continuous possession and in good faith of said tract, peaceably possessing the same. That he pleaded in bar of plaintiff's action the prescription of three, four, five, ten, twenty and thirty years. That the sale to him was made with full warranty of title, and he was entitled to have his vendor cited in warranty to defend the title, and he so prayed. In the event of eviction he prayed for a judgment for the restitution of the price and for the fruits and revenues he might be obliged to return to plaintiff, for costs and for all damages which he

might suffer by reason of plaintiff's action. Chachere answered, pleading, first, the general issue.

Further answering, he averred that on the 29th of May, 1882, he purchased in good faith and for a valuable consideration from Victor C. Sitting, by authentic act duly recorded in the Parish of St. Landry, the property which he described, containing four hundred and thirty-five acres, more or less, being part of the land purchased at tax sale, made by D. C. Sitting, tax collector, in 1871, said land being in section 41, township 7 south, range 1 east. That he had in good faith uninterrupted, peaceable and actual possession of the same since the date of his purchase.

That since the date of his purchase he had paid the taxes thereon at the rate of thirty dollars per year; that he had enclosed the same by a fence worth $750, and made improvements, which he recited. That he pleaded in bar of plaintiff's action the prescription of three, four, five, ten and twenty years. In the event he be not sustained in his defense he prayed that if there should be a decree divesting him of his property, that before he be made to surrender the property, plaintiff reimburse him the amount of taxes he had paid, and the full value of the improvements he had placed upon the property.

Victor Sitting, called in warranty, answered the call in warranty on the 20th September, 1901. He pleaded the general issue, further answering he averred that he had on the 30th of September, 1871, at a tax sale made in accordance with law, bought certain property, which he described, at that time in the Parish of St. Landry. That he took possession of the land immediately after purchasing the same, and continued in good faith and uninterruptedly and peaceably until May 29th, 1882, when he sold one-half of said land for a valuable consideration to Theodore C. Chachere. That from that date he continued in possession of the other half in good faith and uninterruptedly and peaceably up to the time that he sold the same to John P. Boagni on July 24th, 1900.

That his title was duly recorded in the Parish of St. Landry, and the tax sale made to him by the tax collector was duly ratified by the State Auditor, and his ratification duly recorded in St. Landry, on June 13th, 1874. That he had paid taxes on the property while in his possession of six hundred dollars. He pleaded in bar of plaintiff's action the prescription of three, four, five, ten and twenty years.

In the event his title should be set aside and his plea of prescription not sustained, he prayed in reconvention and alternatively for judg-

ment against plaintiff for six hundred dollars, and that payment of same be made before plaintiff should be permitted to take possession.

The District Court rendered judgment decreeing that the claim of the plaintiff be rejected at his costs. That the plea of prescription set up by the defendant be sustained and that they be quieted in their possession of the land described in plaintiff's petition.

Plaintiff individually and as administrator of the succession of Bennet Jopling appealed.

### OPINION.

The plaintiff urges that the defendants are trespassers upon the land, and this claim is based upon the theory that until July, 1900, at which date the United States Government issued a patent in favor of Bennet Jopling, his heirs or assigns, the property in question was the property of the United States.

We do not think there is any dispute between the parties as to the facts.

That on the 12th of March, 1812, the Board of Commissioners appointed under Section 4 of the act of Congress, approved March 3rd, 1807, confirmed to Bennet Jopling, under certificate No. 1927, by *virtue of occupancy and settlement under Joseph Chevalier Poiret* nine hundred and thirteen and ninety-eight-hundredths acres of land in Bayou Mallet woods, in the County of Opelousas.

That on April 29th, 1816, Congress, reciting the various acts bearing upon the subject (Act of March 10th, 1812; Act of February 27th, 1813, and Act of April, 1814), passed an act for the confirmation of certain land claims in the Western District of the State of Louisiana, and that under Section 4 of that act it was enacted " that the claims marked ' B,' described in the reports of the Commissioners for the Western District of the State of Louisiana, formerly Territory of Orleans, and recommended by them for confirmation, be and the same are hereby confirmed." That the claim of Bennet Jopling, covered by certificate No. 1927 of the Board of Commissioners, was confirmed in favor of Jopling by that act of Congress. That, although the claim was so confirmed by act of Congress, no patent was issued for the land by the United States Government until July, 1900.

It is contended in behalf of the plaintiff that until this patent was issued the ownership of the land and the title thereto was in the government of the United States. That the resulting effect of this fact

was that no rights of ownership to third parties could be based or predicated upon Jopling's having any ownership or title to this property prior to the issuance of the patent, nor could any obligations which Jopling may have come under, either to individuals or the State, strike this land or be enforced upon it until a patent for the same had issued. The defendants deny the correctness of this proposition.

The defendants maintain that not only was the claim confirmed by act of Congress, but the land was surveyed and officially located as far back as 1856, under a survey and field notes which had been submitted to and approved by the then surveyor general of the United States for the State of Louisiana.

The plaintiff does not deny that, as a fact, this was the case, but he insists that the evidence in the record does not disclose the *date* of the survey of the claim made by Phelps, or of any approval of his survey and field notes by a surveyor general of the State, prior to James Lewis' approval in 1900, and they maintain that even if such survey had been made and approved by the surveyor general, the survey and approval were inoperative and of no virtue and effect until acted upon in the form of a patent. The following points are made in the syllabus of plaintiff's brief:

1. A patent is the highest evidence of the divestiture of title of the government, and one relying upon prescription accruing before the issuance of such patent, must show a prior divestiture or his plea cannot be maintained. 12 Ann. 151.

2. Until the patent issues, prescription does not run against the government and its grantees. Gibson vs. Chouteau, 13 Wallace, 92; Burgess vs. Gray, 16 Howard, 48; Oaksmith vs. Johnson, 92 U S. 343; Meguire vs. Tylor, 8 Wallace, 650; Sparks vs. Pierce, 115 U. S. 408; 113 U. S. 271; 47 Ann. 579; 132 U. S. 239.

3. Private land claims in the Territory of Louisiana, which had not ripened into complete grants before the cession, required survey, confirmation by the Board of Commissioners, the approval of the Secretary of the Treasury, confirmation by act of Congress, and patent. Such survey should be made under the directions of the surveyor general and be approved by him in order to segregate private land from the public domain. 47 Ann. 579; 13 Ann. 390; 12 Ann. 151; 10 Ann. 133; 9 Ann. 154, 438; 5 Ann. 75, 558; 4 Ann. 99; 3 Ann. 86; 5 N. S. 35; 132 U. S. 239; 16 Howard, 48; 3 Ann. 787; 15 Peters, 75, 184, 215, 319; 16

Peters, 159; 21 Wallace, 521; 4 Sawyer, 536; 3 Sawyer, 66; 16 Wallace (Dent vs. Emmeger), 308.

4. Where such incomplete grants have not been identified and determined to cover a definite location, or are subject to conflicting rights, the land is not liable to taxation. Am. & Eng. Ency. of Law, Vol. 25, page 111, and authorities there cited; 95 U. S. 259, Colo. Co. vs. Comrs.

5. A tax sale of property belonging to a person, notoriously dead long years before the assessment, is null. Stafford's case, 33 Ann. 520.

6. A tax sale which neither recites the assessment, nor any of the formalities required by law, and unaided by proof *aliunde* as to its correctness, is absolutely null and void. Rapp vs. Lowry, 35 Ann. 1275; Lambert vs. Craig, 45 Ann. 1109.

Defendants' counsel submit to the court the following propositions and authorities:

1. The rights of a State to tax lands which have, or may have, belonged to the United States does not depend on the actual issuance of a patent, but on the complete and perfect right of the claimant to demand one. Saunders on Taxation, page 403; Howard (U. S.), page 440; Carroll vs. Stafford; Railroad Co. vs. Prescott, 16 Wallace, 603; Railroad Co. vs. McShane, 22 Wallace, 444; Simien vs. Perrodin, 35 Ann. 931; 4 Ann. 137; Am. & Eng. Ency. of Law, Vol. 19, pages 332-333 and 334; Cooley on Taxation, pages 59 and 60.

It is at this stage (when the right to demand a patent has been bested in the purchaser or claimant) that the land ceases to be the property of the United States and becomes that of the pre-emptor or claimant to such an extent, that it is liable to taxation by the State in which it lies. Am. & Eng. Ency. of Law, Vol. 19, foot notes, page 334.

Where the right to a patent has once become vested in a purcahser of public land, it is equal so far as the government is concerned to a patent actually issued. The execution and delivery of the patent after the right to it has become complete, are the mere ministerial acts of the officers charged with that duty. Barney vs. Dolphe, 97 U. S. 652; Starks vs. Starrs, 6 Wall. (U. S.) 402. The patent is but evidence of a grant, and the officer who issues it acts ministerially and not judicially. Moran vs. Horsky, page 212 of the opinion; 178 U. S., Confirmation of Grants by Congress.

A legislative confirmation of a claim to land is a recognition of the validity of such a claim, and operates as effectually as a grant or quit claim from the government. A patent issued thereunder adds nothing

to the force of the confirmation. It is merely documentary evidence, having the dignity of a record of the existence of the confirmed title. Langdeau vs. Whitney, 88 U. S. 521; Morrow vs. Whitney, 95 U. S. 551; Whitney vs. Morrow, 112 U. S. 693.

If a survey of the land is required the title becomes perfect as soon as made. 88 U. S. 531.

The surveyor general in each State is required to cause to be surveyed all private land claims within his district after they have been confirmed by authority of Congress. Revised Statutes of the United States, Sec. 2223.

A survey having been made in this case by Noah H. Phelps, United States deputy surveyor, the presumption is it was made in pursuance of the above requirement, and this presumption is conclusive until overcome by proof to the contrary. Am. & Eng. Ency. of Law, Vol. 19, page 49, first edition; Stephen's Digest of the Law of Evidence, Art. 101, and authorities quoted in the brief; 35 Ann. 1038, Cole vs. Thompson; 9 Peters, 118; 34 U. S."

In passing upon the questions raised in this case, it will be seen at once that there is no issue between the parties based upon a claim that loss or injury has been occasioned by the Jopling claim having been left after its confirmation by the board and the action by Congress upon the confirmation in an uncertain condition as to its location. No conflict of interests has arisen between different parties by reason of the non-issuing of a patent. All parties admit that Bennet Jopling was entitled to the confirmation of his claim, both from the Board of Commissioners and from Congress, and none of the parties contest, but all admit, that the location of the claim as shown by the survey and field notes attached to and made the basis of the patent is correct. Defendants admit the original ownership of Bennet Jopling to this land. Neither the United States Government nor any one claiming under it adversely to the Jopling confirmation in regard to the land now in controversy is before the court. It is not claimed that there ever has been any adverse claim to it as a whole, though there was at one time a conflict as to a part of the land, other than that involved herein between the Jopling claim and that of one or two other claimants. The conflict did not extend to any portion of the land now in litigation. The Board of Commissioners was not called upon in dealing with Bennet Jopling's claims to act upon a mere "floating" right held by Bennet Jopling entitling him generally to locate land—such a right, for instance, as he

would have had had he been the owner of land scrip entitling him to locate so many given acres of land as he might afterwards select at his pleasure or by agreement between himself and the Board of Commissioners. What they had presented them was a right or privilege claimed to be *already existing upon certain specific property* in favor of Bennet Jopling and *under* and by reason of *the original occupancy and settlement thereon of Joseph Chevalier Poiret,* continued, we presume, by Jopling as Poiret's assignee. The evidence which Jopling introduced before the board in support of his claims is not before us, but unquestionably there was proof before it justifying its confirmation. The certificate which was issued in this matter by the Board of Commissioners was in form as follows:

Number ................................................B, 1927
Date ..................................................March 11
Name of person under whom land was claimed..............
...................................Joseph Chevalier Poiret
In whose favor issued...........................Bennet Jopling
Nature of claim.............................Occupancy, ten years
Situation of land....County Opelousas; water course; Mallet's Woods
Number of acres and hundredths........................918 98-100
Arpents and hundredths in front.............................1080

It is evident that Poiret was shown to the board to have *already occupied and settled a particular body of land for the time stated* and to have *already had an existing right or privilege to a particular tract.* The identity of the tract confirmed must have been fixed by evidence before the board and the survey which followed was unquestionably based upon that evidence preserved and made known to the surveyor. The Jopling claim under Poiret was not based upon the survey, but the survey was based upon the existing claim, and simply identified the land to which Poiret and Jopling were entitled by antecedent occupancy and settlement. The rights of Poiret and Jopling did not originate in the action of the Board of Commissioners and that of Congress. Their action was simply recognitive and declaratory, as the word confirmed used in connection with it plainly shows. The government practically and substantially never claimed this land as belonging to it and as forming part of the public domain. The confirmation was in the nature of a quit claim or relinquishment by the government of any right or interest in the land claimed. The title of Poiret and Jopling

under him was a title other and different from one which would have been held by either under a conditional sale to them of a part of the public domain under a homestead or similar right, where the title was to remain in the government until everything had been done by the vendee or transferree, which the government exacted from him as a condition of obtaining ownership. In such cases the patent and the right of ownership of the land described in it were merged in each other, because, as it were, one and the same, but in the case of a confirmed title, there was no such merger. The right which was confirmed continued throughout separate and distinct, and antedating completely the patent which evidenced not the right, but authentic evidence of the recognition of the right by the government.

Neither Jopling nor his heirs could disconnect themselves so far as they were concerned from their claim of ownership of this land, under Poiret's rights in order for their private purposes to refer the origin of their right of ownership to the patent which the government issued recognizing their right *abinitio*. The plaintiff here is contesting the already acquired rights of their own asserted author. Jopling and his heirs became the absolute owners of the land *which was occupied and settled by Poiret prior to the confirmation,* against the government itself and every one under it from the date of confirmation by Congress. In case any contest should arise prior to the issuing of the patent, the matter would have to be determined by the introduction simply of evidence. The confirmee could call for a government survey, if one had not already been made, and sustain his rights under the confirmation upon such survey, independently of a patent. If, however, a survey of the claim was necessary in order to complete the transfer of ownership of this property to Jopling, we are satisfied that a survey of the same was made and approved by the surveyor general, W. J. McCulloh, as far back as 1856. The present surveyor general of Louisiana refers to the survey and field notes of Phelps as having been approved, but not as a matter of original approval by himself, as the plaintiff seems to contend. In the act of sale of this land under which the plaintiff claims from James W. Jopling to James H. Houston, Jr., the land transferred is referred to as a " Spanish grant," with the added words (see parish map and a list of private land claims, where the above described property is well defined as belonging to Bennet Jopling). We have before us a copy of the parish map here referred to with the different private claims (among others that of Bennet Jop-

ling) distinctly set out and the surveys on which they were located minutely detailed, certified to as far back as 1856 by the surveyor general. It may be that it is not strictly and technically in evidence, but it is before us by reference in one of the acts, and were we not to act upon it the only effect would be to remand uselessly the case in order to have it formally introduced.

This sale of the property from James W. Jopling to Samuel H. Houston, Jr., was made on the 18th of May, 1895, antedating by several years the issuing of the patent which the plaintiff now insists was essentially necessary to convey title either to Bennet Jopling or his heirs. Plaintiff claims by purchase. If James W. Jopling had any rights in this property they were not original, but derivative rights, derived through and under the confirmation of Bennet Jopling. We are of the opinion that the property in question became the property of Bennet Jopling from the moment his claim was confirmed by act of Congress, and became subject from that time in his favor to full rights of ownership, and that it became subject also from that time to all the obligations which are incidental to property held in private ownership by individuals—among other obligations to that of State taxation.

We are informed by the record that the property was sold in 1871 to Victor Sitting in enforcement of State taxes assessed upon it in the name of Bennet Jopling and that the sale made was confirmed by the State Auditor in 1874, and that that act of confirmation was placed of record at that time in the Parish of St. Landry. That the tax purchaser, Sitting, and his vendees, Chachere and Boagni, have had actual corporeal possession of the property ever since 1871, the defendant Chachere holding title to a portion of the property by purchase on the 29th of May, 1882, and the defendant Boagni to the balance of the property by purchase on the 24th of July, 1900. The defendants have set up their respective titles and pleaded in bar of plaintiff's action the prescription of three, four, five, ten and twenty years.

The plaintiff urges that a tax sale of property belonging to a person notoriously dead long years before the assessment, and in support of this contention he cites Stafford's case, 33 Ann. 520, and further that a tax deed which neither recites the assessment nor any of the formalities required by law, and unaided by proof *aliunde* as to its correctness is absolutely null, and in support of this proposition, he cites Rapp vs. Lowry, 35 Ann. 1275, and Lambert vs. Craig, 45 Ann. 1105.

The plaintiff did not attack by direct action the tax sale made of this

property in 1871, under which the defendants have held actual corpo-
real possession since that time. He ignored that sale altogether and
brought a petitory action for the property. He filed no pleadings after
the defendants had set up the tax sale of 1874 as the original source of
their title, nor did he introduce evidence to break the force and effect of
a tax deed. The fact of Bennet Jopling's death was accidentally brought
out as having occurred many years ago, in connection with the admin-
istration of his succession, and his title to the property. The plaintiff
testified that he himself was fifty-three years of age; that he knew
nothing of Bennet Jopling except by reputation; that he died long
before the witness could remember. The plaintiff, upon a collateral
attack which he makes upon a tax sale nearly thirty years after it took
place, relies upon its being held to be absolutely null and void by rea-
son of the insufficiency of the recitals of the tax deed in respect to the
observance of the legal formalities preceding the sale. Plaintiff is cor-
rect in his statement that upon a number of occasions we have declared
that an assessment made in the name of a dead person is improperly
made and carries with it the nullity of a tax sale based upon it, but that
rule has its limitations and we do not think it can or should be applied
in this case. It is a latent defect which the tax purchaser is not bound
to ascertain or know. It is not one whose actual existence cuts him off
from invoking good faith as a basis for the prescription of ten years
*acquirendi causa.*

We have just held that the property in question was in Bennet Jop-
ling from the time of its confirmation by Congress, if not before.

That from that time it became subject to State taxation. All prop-
erty in the State, independently of the question as to who is the owner
of the particular property, is subjected to taxation and to expropriation
for the purpose of carrying on the State government, though the State
recognizes the individual rights of parties in property and has sought
to prevent their divestiture in various ways.

It has enacted laws by which an assessment of property for purposes
of taxation should be made annually commencing and closing at a cer-
tain fixed date. It has fixed the date of the delinquency of taxes and
the time and place of tax sales. It has sought to give notice to parties
interested in particular property by placing the names of such parties
in connection therewith, as far as they could be ascertained, upon the
assessment rolls, and in the proceedings connected with the tax sales,
but it has cast upon owners the affirmative duty and obligation of mak-

ing themselves known by furnishing assessment estimates of their property to the State officials. Now neither Bennet Jopling nor any one claiming rights upon this property have ever (so far as the record shows) paid a dollar of taxes upon it, made any returns for assessment purposes or advanced any right or claim of ownership to it since the confirmation of title. Bennet Jopling, we are informed by the record, was a soldier in the Revolutionary War, and necessarily died many years ago. He and his heirs entirely disappeared. Their residence, even their existence, was unknown, but it did not follow from this fact that the property in Louisiana was not subject to assessment for and liability to sale for taxes. The law expressly provides for the assessment and sale of property of unknown owners, and the assessment and sale of this property as property of an unknown owner would have passed the title. The parties concerned would under such circumstances have received by mere description of the property itself no warning whatever of their interest in the subject-matter. They certainly have no reason, real or equitable, to complain that the name of the original owner, as shown by the record, should have been made to appear in the proceedings.

If the assessment and sale of the property as belonging to an unknown owner would have conveyed the title, plaintiff cannot urge now adversely to the proceedings the placing therein of the name of the original owner, a fact calculated to call the special and direct attention of the Jopling family to the matter. We think the case is covered by that of Webre vs. Lutcher and Moore, 45 Ann. 574, and Michel vs. Stream, 48 Ann. 341. Plaintiff is seeking to enforce a neglected and apparently an abandoned right to the ownership and possession of property, to the prejudice of parties who have been in possession of it nearly long enough to have acquired ownership of the same without any title whatever.

These particular parties, however, hold in good faith under titles derived originally through official proceedings taken out by State officers in the enforcement of the State's rights. They are not trespassers, as the plaintiff alleged them to be, nor were they originally trespassers. The mere conclusion of law to that effect announced by the plaintiff is backed by no fact. The mere failure of the tax collector in the deed to make recitals of fact which it would have been proper for him to have made does not render *ipso facto* the tax sale, to which it refers, absolutely null and void or destroy the good faith of the purchaser at the

tax sale in taking possession of and holding the property as owner under it. (Welsh vs. Augusti, 52 Ann. 1955.) The failure of proper recitals in a tax deed may bring about very serious trouble under some conditions and circumstances, but it does not carry, under the circumstances of this case, the legal results which the plaintiff contends for. In Michel vs. Stream this court said: " It will be seen that the Code recognizes the existence of an abandonment, as it were, of the right of even the right of constructive or civil possession resulting from ownership, not necessarily working an abandonment of ownership, but possibly modifying and affecting very materially the rights of the owner, though ownership may be retained and the possession resumed. This condition of affairs, if rights or claims of third parties under color of title should have intervened, may be attended with serious (sometimes insurmountable) difficulties."

" So long as the owner of property holds it in actual possession he occupies a position of great advantage as against adverse claims advanced against him. As he loses his grasp upon the possession he surrenders this vantage ground, and when in order to retake his own he should be forced to have recourse to judicial proceedings, he may find himself successfully met by pretensions which originally would have been held utterly without foundation or merit. Prescription *acquirendi causa* or *liberendi causa* may cut off the enforcement of his rights."

This is precisely what has happened here. The plaintiff occupies *quoad* the State and the parties holding under the State's title the status of an *unknown owner,* reappearing to assert neglected, abandoned rights to the prejudice of parties holding titles acquired from the State in good faith and holding actual possession under them for nearly thirty years. Plaintiff's claim is without equity. They cannot oust the defendants from property which they have bought, paid for and improved, while they have stood in the background until values have risen, to which they have contributed nothing. 145 U. S. 317; 45 U. S. 368; 178 U. S. 208.

We think the judgment is correct and it is hereby affirmed.

MONROE, J.   I concur in the decree.

Rehearing refused.

NOTE.—This case was, subsequently, removed to the Supreme Court of the United States by writ of error.